# No. 24-305

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

TREJOS HERMANOS SUCESORES S.A.,

*Plaintiff-Appellee*,

v.

VERIZON COMMUNICATIONS INC.,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of New York
No. 1:21-cv-8928 (Judge Jennifer L. Rochon)

## OPENING BRIEF OF APPELLANT VERIZON COMMUNICATIONS INC.

Scott A. Edelman
GIBSON DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, CA  90067
(310) 557-8061

Perlette Michèle Jura
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7121

Thomas H. Dupree Jr.
Jeremy M. Christiansen
Claire V. Madill
Cameron J.E. Pritchett
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036
(202) 955-8500

*Counsel for Verizon Communications Inc.*

## CORPORATE DISCLOSURE STATEMENT

Verizon Communications Inc. is a publicly held corporation that has no parent company, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

JURISDICTIONAL STATEMENT ....................................................................6

ISSUES PRESENTED .........................................................................................7

STATEMENT OF THE CASE..............................................................................7

A.  The contracts to print phone books.................................................8

B.  The proceedings in Costa Rica. .....................................................10

C.  The judgment-recognition proceeding in New York. ....................15

SUMMARY OF ARGUMENT ...........................................................................17

STANDARD OF REVIEW .................................................................................20

ARGUMENT .......................................................................................................20

I.  The District Court Erroneously Gave Preclusive Effect To The Costa Rican Courts' Decisions. ........................................................20

II.  The District Court Erred In Recognizing The Costa Rican Judgment Because The Judgment Violated An Arbitration Agreement......................26

    A.  Verizon Communications Established Three Grounds For Non-Recognition Based On The Arbitration Agreement...........................27

    B.  The Costa Rican Courts' Failure To Enforce The Arbitration Agreement Does Not Preclude The Arbitration-Related Defenses. ...32

III.  The District Court Erred In Recognizing The Costa Rican Judgment Because There Is A Genuine Dispute Over Whether The Foreign Proceedings Lacked Integrity And Violated Due Process. ...........................34

    A.  Article 53 Requires An Assessment Of The "Circumstances" Giving Rise To The Judgment And A Focus On The "Specific Proceeding." ......................................................................35

B.    The Costa Rican Proceedings Lacked Integrity And Violated Due Process. ..........................................................................36

IV.   The District Court Erred In Denying Verizon Communications Any Fact Discovery Before Granting Summary Judgment. ..................................43

A.    Rule 56(d) Allows Discovery "Germane To A Defense."..................43

B.    Verizon Communications Was Entitled To Fact Discovery..............45

CONCLUSION.......................................................................................50

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ackermann v. Levine*,
  788 F.2d 830 (2d Cir. 1986) ...............................................................24

*Akhmedova v. Akhmedov*,
  139 N.Y.S.3d 33 (App. Div. 2020) ....................................................36

*Alphonse Hotel Corp. v. Tran*,
  828 F.3d 146 (2d Cir. 2016) ........................................................43, 44

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
  170 F.3d 349 (2d Cir. 1999) ...............................................................31

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharmaceutical Co. Ltd.*,
  585 U.S. 33 (2018) .......................................................................23, 24

*In re Arbitration Between Chromalloy Aeroservices &
  Arab Republic of Egypt*,
  939 F. Supp. 907 (D.D.C. 1996) ..................................................30, 33

*Ass'n of Car Wash Owners Inc. v. City of New York*,
  911 F.3d 74 (2d Cir. 2018) .................................................................44

*Automotores Galindo, S.A. v. Ford Motor Co.*,
  2015 WL 4606561 (S.D. Fla. July 31, 2015) ...................29, 32, 33, 34

*Bainbridge Fund Ltd. v. Republic of Argentina*,
  37 F.4th 847 (2d Cir. 2022) ................................................................41

*Com. Cleaning Servs., LLC v. Colin Serv. Sys., Inc.*,
  271 F.3d 374 (2d Cir. 2001) ...............................................................44

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
  650 F. Supp. 2d 314 (S.D.N.Y. 2009) ................................................21

*Curtis, Mallet-Prevost, Colt & Mosle, LLP v. Garza-Morales*,
  762 N.Y.S.2d 607 (App. Div. 2003) ...................................................30

*In re Dana Corp.*,
  574 F.3d 129 (2d Cir. 2009) ...............................................................49

*Diorinou v. Mezitis*,
  237 F.3d 133 (2d Cir. 2001) ........................................................24, 25

*Dubai Islamic Bank v. Citibank, N.A.*,
126 F. Supp. 2d 659 (S.D.N.Y. 2000) .............................................45

*EEOC v. Waffle House, Inc.*,
534 U.S. 279 (2002) ...........................................................................39

*Elliott v. Cartagena*,
84 F.4th 481 (2d Cir. 2023) ........................................................20, 44

*Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*,
809 F.3d 737 (2d Cir. 2016) ..............................................................20

*Films by Jove, Inc. v. Berov*,
250 F. Supp. 2d 156 (E.D.N.Y. 2003) ..........................................24, 42

*Hellstrom v. U.S. Dep't of Veteran Affs.*,
201 F.3d 94 (2d Cir. 2000) .................................................................44

*Hilton v. Guyot*,
159 U.S. 113 (1895) ............................................................................24

*ICC Chem. Corp. v. TCL Indus. (Malaysia) SDN*,
206 F. App'x 68 (2d Cir. 2006) ...............................................25, 26, 32

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) .................................................................20

*In re Long Island Power Auth. Hurricane Sandy Litig.*,
87 N.Y.S.3d 576 (App. Div. 2018) .....................................................30

*Matzell v. Annucci*,
64 F.4th 425 (2d Cir. 2023) ...............................................................22

*Meloff v. N.Y. Life Ins. Co.*,
51 F.3d 372 (2d Cir. 1995) .................................................................44

*Miller v. Wolpoff & Abramson, LLP*,
321 F.3d 292 (2d Cir. 2003) ...............................................................44

*Montebueno Mktg. v. Del Monte Foods Corp.-USA*,
2012 WL 986607 (N.D. Cal. Mar. 22, 2012) .....................................29

*Montebueno Mktg. v. Del Monte Foods Corp.-USA*,
570 F. App'x 675 (9th Cir. 2014) ...............................................29, 33

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*,
182 F.3d 157 (2d Cir. 1999) ...............................................................43

*Network Fin. Inc. v. JPMorgan Chase & Co.*,
41 A.D.3d 254 (N.Y. App. Div. 2007) ................................................24

*Nicor Int'l Corp. v. El Paso Corp.*,
  292 F. Supp. 2d 1357 (S.D. Fla. 2003) ........................................................30, 33

*Oakley v. Dolan*,
  2023 WL 3263618 (2d Cir. May 5, 2023) ..........................................................49

*Revis v. Schwartz*,
  140 N.Y.S.3d 68 (App. Div. 2020) ....................................................................28

*Seetransport Wiking Trader v. Navimpex Centrala Navala*,
  989 F.2d 572 (2d Cir. 1993) ..............................................................................34

*SerVaas Inc. v. Republic of Iraq*,
  540 F. App'x 38 (2d Cir. 2013) .........................................................................20

*Servipronto De El Salvador, S.A. v. McDonald's Corp.*,
  837 F. App'x 817 (2d Cir. 2020) .......................................................................34

*Shearson/Am. Express, Inc. v. McMahon*,
  482 U.S. 220 (1987)...........................................................................................30

*Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*,
  198 F.3d 88 (2d Cir. 1999) .............................................................................31, 39

*Soc'y of Lloyd's v. Edelman*,
  2005 WL 639412 (S.D.N.Y. Mar. 21, 2005).....................................................35

*Sung Hwan Co., Ltd. v. Rite Aid Corp.*,
  847 N.Y.S.3d 78 (App. Div. 2007)....................................................................26

*Sutera v. Schering Corp.*,
  73 F.3d 13 (2d Cir. 1995) ..................................................................................44

*Trejos Hermanos Sucesores S.A. v. Verizon Commc'ns Inc.*,
  No. 1:21-cv-08928 (JLR), 2024 WL 149551
  (S.D.N.Y Jan. 12, 2024).......................................................................................8

*Tyco Valves & Controls Distrib. GmbH v. Tippins, Inc.*,
  2006 WL 2924814 (W.D. Pa. Oct. 10, 2006).................................................29, 33

*United States v. Rechnitz*,
  75 F.4th 131 (2d Cir. 2023) ...............................................................................46

*United States v. Schultz*,
  333 F.3d 393 (2d Cir. 2003) ..............................................................................42

*Yukos Cap. S.A.R.L. v. OAO Samaraneftegaz*,
  963 F. Supp. 2d 289 (S.D.N.Y. 2013) ...............................................................21

## Statutes

28 U.S.C. § 1291 ...................................................................6

28 U.S.C. § 1332 ...................................................................6

28 U.S.C. § 1441 ...................................................................6

28 U.S.C. § 1446 ...................................................................6

CPLR § 5300 *et seq.* ........................................................4, 8, 16

CPLR § 5304..................................................................*passim*

## Rules

Fed. R. App. P. 4 ..................................................................6

Fed. R. Civ. P. 44.1 .............................................................42

Fed. R. Civ. P. 56(d) ..................................... 16, 20, 43, 44, 45, 47, 48

## Other Authorities

Joel R. Brandes, *Law and the Family New York* (2023 ed.)....................................41

Montré D. Carodine, *Political Judging: When Due Process Goes International*, 48 Wm. & Mary L. Rev. 1159 (2007)........................................41

N.Y. Bill Jacket, 2021 S.B. 523, Ch. 127 ...........................................24, 25, 34, 36

Richard C. Reilly, *Practice Commentaries to Section 5304 (Proceeding Contrary to Agreement)* (2021) ....................................23

Restatement (Second) of Conflicts (Supp. 1988) .........................................34

Siegel, *New York Practice* ..................................................................24, 36

Unif. Foreign-Country Money Judgments Recognition Act (2005).........................21

## INTRODUCTION

New York's judgment-recognition statute vests the courts with a critical and independent role in preventing foreign judgments obtained through the violation of an arbitration agreement, or procured by unfair or corrupt means, from being converted into judgments enforceable in the United States. In this case, however, the district court all but rubber-stamped a foreign judgment of more than $100 million against Verizon Communications. Despite a clear and unambiguous agreement to arbitrate, and despite pervasive irregularities that called into question the integrity of the foreign proceedings, the district court denied Verizon Communications any fact discovery and rejected its arguments against recognition on the basis that it was bound by the determinations of the foreign courts whose judgment was under review.

Verizon Communications' legal nightmare began when a Costa Rican printing company—Trejos Hermanos Sucesores ("THS")—sued it in a Costa Rican administrative court for breach of a contract to print phone books. The claim was frivolous: Verizon Communications was not even a party to the contract and had no involvement whatsoever in the underlying dispute. But it was a deep-pocketed U.S.-based company that was affiliated, and shared part of its name, with a separate company, Verizon Costa Rica.

The plaintiff's strategy was transparent. THS's owners, the prominent and powerful Trejos family, had strong ties to the Costa Rican government. The family includes the former president of Costa Rica and his two sons, both of whom served in Costa Rica's national congress. And THS's choice of attorneys to fill its curated legal team was ominous and left no doubt of what was about to happen. Its lead counsel had employed one of the judges slated to hear the case as his clerk, and the judge had publicly described the lawyer as her "mentor" and a "father" figure in her life. Another THS attorney had no litigation experience. But he happened to be the brother of the former President of the Supreme Court of Justice of Costa Rica.

Even though the phone-book-printing contract contained a mandatory arbitration clause requiring that claims of breach "shall" be arbitrated, the Costa Rican court exercised jurisdiction over THS's breach-of-contract claim. The court held a trial, but Verizon Communications never stood a chance and the outcome was never in doubt. The centerpiece of THS's case was an "expert" damages report that fell so far below a professional presentation that it raised questions "whether the author . . . had relevant training or experience" in the subject matter. The contract for phone book printing was worth less than $10 million had it been fully performed. But the Costa Rican court found the "expert" report persuasive and entered a judgment against Verizon Communications for $51 million plus "additions" later calculated to be an additional $55 million.

Things did not go better on appeal. In light of THS's and its lawyers' close personal connections with the judges, Verizon Communications moved to recuse the judges slated to hear its appeal. That request was initially granted, but quickly reversed without explanation. The Supreme Court of Justice then affirmed the judgment in full.

THS brought the Costa Rican judgment to New York and asked the district court to recognize it. Verizon Communications requested to take fact discovery to bolster its many arguments for non-recognition. Among other things, it sought to uncover documents and communications, including between THS and members of the Costa Rican government and judiciary, to determine whether THS and its lawyers communicated *ex parte* and collaborated with members of the Costa Rican government and judiciary in preparing and managing this lawsuit from inception through the stunning judgment.

The district court barred Verizon Communications from conducting any fact discovery. Then it granted summary judgment in THS's favor, rejecting all of Verizon Communications' defenses to recognition. The district court did not question the existence of the mandatory arbitration provision, but held that because the Costa Rican courts had exercised jurisdiction notwithstanding the arbitration provision, the district court was powerless to "revisit" their determination and was bound by it. The district court took the same approach to all of Verizon

Communications' defenses. It held that the Costa Rican courts had already decided the issues, and that a United States district court was bound by those determinations and had no duty to conduct an independent assessment of the grounds for non-recognition. The district court also held that Verizon Communications had failed to identify any evidence that the Costa Rican proceedings lacked integrity or violated due process—the very evidence the district court had barred Verizon Communications from obtaining through discovery. The district court determined the value of the "additions" to be $55 million, for a total award of approximately $106 million—for a contract to print phone books that had been worth less than $10 million.

The district court erred in four key respects.

**First**, the district court made a clear error of law in holding that it was precluded from considering any issue that was or could have been addressed by the Costa Rican courts. By concluding that Verizon Communications' arguments for non-recognition had been resolved in Costa Rica and were "not for this Court to revisit," SA16, the court abdicated its obligation to bring its own independent judgment to bear in determining whether recognition was warranted under Article 53—New York's judgment-enforcement law, CPLR § 5300 *et seq.*

**Second**, the district court erred in recognizing the judgment because it was obtained in violation of a mandatory arbitration clause. There is no dispute that the

4

phone-book printing contract provided that all claims related to the contract "shall be resolved by final and binding arbitration." JA1011. New York's judgment-recognition law, CPLR Article 53, is crystal clear that American courts must respect arbitration agreements: it provides three separate grounds for non-recognition where, as here, the dispute should have been arbitrated.

*Third*, the district court erred in recognizing the judgment under the newly-strengthened Article 53 protections against foreign judgments obtained through unfair or corrupt means. The drafters of the amended statute could have had this case in mind when they authorized courts to deny recognition under "circumstances that raise substantial doubt about the integrity of the rendering courts with respect to the judgment" or where "the specific proceeding in the foreign court . . . was not compatible with the requirements of due process of law." CPLR § 5304(b)(7), (8). Here, the district court erred by focusing on the integrity of the Costa Rican legal system as a whole rather than what occurred in this particular proceeding.

*Fourth*, the district court wrongly barred Verizon Communications from conducting any fact discovery, then compounded its error by granting THS summary judgment because Verizon had failed to produce evidence creating a factual dispute. The court acknowledged "it is the rare case that [a court] adjudicates summary judgment without any discovery," JA571, but proceeded to adjudicate a $106 million

summary judgment motion without allowing Verizon Communications to obtain evidence that was indisputably germane to its defenses to recognition.

This appeal raises important issues concerning a court's duty to ensure that any foreign judgment proposed for recognition is worthy of being converted into a judgment of a United States court. Because the district court misapprehended the nature of its duty, and denied Verizon Communications any opportunity to obtain evidence supporting its case for non-recognition, this Court should reverse the decision below.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this action under 28 U.S.C. §§ 1332, 1441, and 1446 because there is complete diversity between the parties, and the amount in controversy exceeds $75,000. Verizon Communications is a citizen of Delaware and New York; THS is a citizen of Costa Rica. JA15. THS pled damages of more than $90 million and was ultimately awarded more than $100 million. JA16; SA33. This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on January 23, 2024, SA33, and Verizon Communications filed a timely notice of appeal on January 31, 2024, JA2521. *See* Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED

1.    Did the district court err in holding it lacked the authority to consider grounds for Article 53 non-recognition if the Costa Rican courts had or could have decided the question?

2.    Did the district court err in recognizing the Costa Rican judgment where the foreign courts lacked subject-matter jurisdiction, and where the judgment was obtained in violation of an arbitration agreement and the strong U.S. and New York policies favoring arbitration?

3.    Did the district court err in recognizing the Costa Rican judgment where it was rendered in circumstances that raised substantial doubt about the integrity of the rendering courts with respect to the judgment, and where the specific proceedings in Costa Rica were not compatible with the requirements of due process of law?

4.    Did the district court err and abuse its discretion in denying Verizon Communications any fact discovery to support its defenses to recognition—and then granting THS summary judgment while faulting Verizon Communications for failing to submit evidence creating a factual dispute?

## STATEMENT OF THE CASE

This is an appeal from a judgment-recognition proceeding. Verizon Communications appeals from the district court's decision to deny its request for fact discovery and then to grant summary judgment for THS on the question whether a

7

Costa Rican judgment against Verizon Communications should be recognized under CPLR § 5300 *et seq*. Judge Abrams of the United States District Court for the Southern District of New York denied the request for fact discovery. JA569–75. Judge Rochon of that same court granted summary judgment for THS and entered final judgment. SA1–33; *Trejos Hermanos Sucesores S.A. v. Verizon Commc'ns Inc.*, No. 1:21-cv-08928 (JLR), 2024 WL 149551 (S.D.N.Y Jan. 12, 2024).

## A. The contracts to print phone books.

This dispute arises from a contract to print phone books in Costa Rica. Three Costa Rican companies were involved:

- **Trejos Hermanos Sucesores**—or "**THS**"—was a printing business in Costa Rica owned by the well-known Trejos family. JA1168. The family includes the former president of Costa Rica and his two sons, both of whom are former congressmen and one of whom is also a former cabinet member in the Costa Rican government. *Id.* The family has strong ties to one of the two dominant political parties in Costa Rica. *Id.*

- **Verizon Information Services Costa Rica**—or "**Verizon Costa Rica**"—is a private telecommunications company that does business in Costa Rica. It is a separate company from Verizon Communications, the appellant in this case. Although Verizon Costa Rica and Verizon

8

Communications are affiliates—both were formed out of the GTE-Bell Atlantic merger, and Verizon Communications owns a majority stake in Verizon Costa Rica's parent company—they have always maintained their distinct corporate identities. JA1251, 2434; SA2. Verizon Communications is a U.S.-based corporation with its headquarters in New York, and has no operations or places of business in Costa Rica. JA1169, 2421–22, 2429–30, 2433.

- **The Instituto Costarricense de Electricidad**—or "**ICE**"—is Costa Rica's government-owned telecommunications company. SA1; JA2434.

In 2000, a consortium of private companies related to GTE contracted with ICE to produce telephone directories in Costa Rica (the "GTE-ICE contract"). JA2428, 2434; SA1–2. One of the companies in the GTE consortium was a small company that later became Verizon Costa Rica after the GTE-Bell Atlantic merger. JA2434.

The GTE-ICE contract permitted Verizon Costa Rica to subcontract certain obligations. JA957, 2434. In 2002, Verizon Costa Rica subcontracted the printing of some phone books to THS. JA989–1014; SA2. This subcontract—known as the Master Purchase Agreement—is at the heart of this dispute.

9

The term of the Master Purchase Agreement was limited to the term of the GTE-ICE contract. JA992–93, 2435. The Master Purchase Agreement gave Verizon Costa Rica the right to terminate the Master Purchase Agreement "immediately" if the GTE-ICE contract were "terminated for any reason whatsoever." JA1008. And the Master Purchase Agreement waived any liability of Verizon Costa Rica resulting from such termination. JA1009, 2435.

The Master Purchase Agreement contained a mandatory arbitration provision: "[A]ny dispute, controversy or claim arising out of or relating to this Agreement or any breach thereof, shall be resolved by final and binding arbitration." JA1011. It specified the location of the arbitration (Puerto Rico); the law governing contract interpretation (Costa Rican); the language of the proceeding (English); the rules of arbitration governing the proceeding (the International Chamber of Commerce's Rules of Conciliation and Arbitration); and the necessary qualifications for the arbitrators. JA1011–12.

### B. The proceedings in Costa Rica.

ICE terminated the GTE-ICE contract in 2005. SA2; JA2436. Verizon Costa Rica exercised its right to immediately terminate the Master Purchase Agreement as well. *Id.*

1. THS sued Verizon Costa Rica, Verizon Communications, and ICE for breach of the Master Purchase Agreement, even though neither Verizon

Communications nor ICE was a party to the contract. SA2; JA2421, 2433, 2436.

THS did not initiate arbitration as the Master Purchase Agreement required. JA1011, 1225, 2438. THS did not even sue in Costa Rica civil court, the court with jurisdiction over commercial lawsuits between private parties like THS and Verizon Costa Rica. JA1225, 2439. Instead, THS sued in Costa Rica administrative court— the Tribunal Contencioso Administrativo y Civil de Hacienda—a court whose jurisdiction is limited to disputes involving public entities. JA142, 531–32, 1225, 2439. To justify filing in that court, THS joined ICE, the government-owned telecommunications company, as a defendant. JA535, 1225, 2436, 2439. The joinder was pretextual—ICE was not a party to the Master Purchase Agreement, and unsurprisingly was found not liable for breach. JA535, 1225, 1227, 2436. But Verizon Communications could not challenge the pretextual joinder (and the administrative court's resulting jurisdiction) at the outset of the case because, under Costa Rican civil law, there are no special procedures allowing a limited appearance for a threshold determination of jurisdiction. JA1178–79.

Even though Verizon Communications has no presence in Costa Rica, even though Verizon Communications is a separate company from Verizon Costa Rica, and even though Verizon Communications was not a party to the Master Purchase Agreement and had no involvement whatsoever in the underlying dispute, it was

11

required to appear in Costa Rican administrative court to respond to THS's lawsuit. JA1169, 1178–79.

Verizon Communications and Verizon Costa Rica argued the administrative court lacked subject-matter jurisdiction because the parties had agreed to resolve the dispute through arbitration. Dkt. 53 at 28–31; JA1220, 2425–26. But the court held that it had jurisdiction because ICE had been named as a defendant. JA1187–88. Verizon Communications also argued the court lacked jurisdiction because the parties to the Master Purchase Agreement were private companies, not governmental entities. Dkt. 53 at 12, 31–32. The court rejected that argument too, holding that THS's decision to name ICE as a defendant sufficed to establish jurisdiction. JA1170, 1179, 1225.

The administrative court found Verizon Communications liable for breaching a contract to which it was not a party. To reach this result, the court invoked the "economic interest group" theory. JA770–72, 1171, 2437. The "economic interest group" theory permits liability notwithstanding corporate separateness when companies are organized for the specific purpose of defrauding creditors. JA1171, 1226. That the court decided the case based on this theory was surprising because THS had never alleged that Verizon Costa Rica and Verizon Communications had organized themselves for the specific purpose of defrauding THS, nor did the administrative court make any such finding. JA1171–72, 1184, 2437, 2440. In the words of

12

Verizon Communications' expert on Costa Rican law, "the Administrative Court improperly stretched the bounds of Costa Rican law to place all liability" on Verizon Communications and Verizon Costa Rica. JA1170–71. The court found the government-owned ICE not liable at all. JA1170, 1177.

The administrative court turned to damages. THS submitted a report from a purported expert named Tomás Evans Salazar. JA784, 1194, 1252. The Evans Report was riddled with glaring mathematical errors, including many instances of double-counting. JA1195–97, 1252–57, 1258–74. The mistakes were so basic and so extreme that Verizon Communications' expert economist wondered "whether the author of the Evans Report had relevant training or experience in this specialized subject matter." JA1244; *see also* JA2412 (noting that Evans "did not have the professional background indicating that he could handle complex damages analyses"). The Evans Report concluded that THS had suffered more than $51 million in damages from the breach of the Master Purchase Agreement—"the equivalent of more than 50 years of expected profits under the contract," which had an 8-year term. JA1247. The $51 million damages claim dwarfed the $10 million in damages ICE claimed for the breach of the GTE-ICE contract, even though the Master Purchase Agreement was a *subcontract* of the GTE-ICE contract. JA30, 2412.

The administrative court appointed a purportedly independent "judicial expert" to review the Evans Report. JA784, 1252. The judicial expert had a strong

incentive to approve the award: His fee was "tied to the size of the paid damages award." JA2413. Specifically, "the court-appointed expert's fees were determined as a percentage of the amount of the . . . damages assessment," so "[l]owering the damages award proposed by THS in any meaningful way meant the court-appointed expert would be lowering his fees in a meaningful way too." JA1198–99 (emphasis omitted). The judicial expert did not conduct his own independent analysis of the Evans Report. The court largely rubber-stamped the judicial expert's recommendation, awarding $51 million in damages. JA1198, 2442.

Next, the administrative court awarded "post-judgment additions." These "additions" included indexation, interest, and legal fees and costs. JA1257–58, 1274. The court did not quantify the amount of the "additions" before entering judgment against Verizon Communications. JA512, 2423, 2437.

**2.** Verizon Communications appealed to the Supreme Court of Justice of Costa Rica. JA2425. That is the highest court in the country, and it has four distinct "Chambers" divided by subject matter. JA1175. The First Chamber hears civil, commercial, and administrative cases. *Id.*

Verizon Communications was deeply concerned about the close connections between THS's lawyers and the judges slated to hear its appeal. THS's lead counsel, Eduardo Sancho Gonzalez, "had great influence over key people in the Administrative Court and the First Chamber," including Judge Rocio Rojas Morales, who was

Sancho's former clerk. JA2411. Judge Rojas had publicly described Sancho as her "mentor" and a "father" figure in her life. *Id.* Another member of THS's legal team had no litigation experience, but was the brother of the former President of the Supreme Court of Justice. *Id.*

Verizon Communications filed a formal request for the First Chamber judges to recuse themselves. JA2411. A Costa Rican judge found Verizon Communications' concerns to be well-founded and issued an order that the sitting judges be dismissed. JA2411–12. But the order was quickly reversed without explanation, and the original panel reinstated. *Id.*

The First Chamber affirmed the judgment for breach of contract in a short opinion that "copied and pasted the reasoning of the Administrative Court." JA2412; *see also* JA909–15. As Verizon Communications' Costa Rican law expert explained, the court failed to "meaningfully evaluat[e] or seriously consider[] the significant legal errors in the Administrative Court's decision" and appeared to "fundamental[ly] misapprehen[d]" the facts of the case. JA1201.[1]

### C.   The judgment-recognition proceeding in New York.

THS brought its Costa Rican judgment to New York and sought to have it recognized in state court. JA14, 21. Verizon Communications removed the case to

---

[1]   By the time of the Costa Rican judgment, THS had gone out of business. The rise of cell phones and the Internet made printed phone books obsolete. JA1197.

federal court, and THS immediately moved for summary judgment, relying on New York's Article 53, CPLR § 5300 *et seq*., as the basis for recognition. *See* JA14; Dkts. 11, 12.

Verizon Communications asserted several defenses to recognition and moved for discovery under Federal Rule of Civil Procedure 56(d). Dkts. 26–27. It provided an affidavit setting forth in detail its need for discovery, explaining precisely what it sought and why the evidence would be relevant to its defenses. JA528–43. Among other things, it sought communications between THS (or its lawyers) and Costa Rican judges and government officials concerning the case. JA542. It also sought documents and communications concerning the negotiation of the arbitration provision in the Master Purchase Agreement. JA540. And it sought communications between THS and ICE that would confirm the pretextual reason for joining ICE as a defendant. JA535–36.

The district court acknowledged that denying fact discovery is "rare[ly]" appropriate. JA571. But it then denied Verizon Communications *any* fact discovery on the basis that it found Verizon Communications' requests "speculative." JA572–73. Instead, the district court allowed only limited expert discovery. JA571.

The district court granted THS summary judgment, rejecting all of Verizon Communications' defenses and recognizing the Costa Rican judgment. SA1–32. The court declined to consider the merits of Verizon Communications' non-

recognition arguments because Verizon Communications had "litigated the issues at hand in Costa Rica." SA20. The court acknowledged the Master Purchase Agreement contained a mandatory arbitration provision, but explained that "the Supreme Court of Justice rejected Verizon's arguments [concerning the arbitration clause] and held that the [administrative court] had subject-matter jurisdiction over the claims." SA24. The court stated that it would "not revisit the determination of the Supreme Court of Justice." SA23–27. The court also rejected Verizon Communications' argument that the specific proceedings in the Costa Rican courts lacked integrity and violated due process. SA13–22, 27–29. The court explained that the Costa Rican judicial system in general has integrity, and faulted Verizon Communications for "not cit[ing] to any evidence" that would support its defense. SA29.

The district court determined the amount of the "additions" awarded by the Costa Rican court to be roughly $55 million. SA29–33; JA2506–19. It entered final judgment for THS in the amount of $106,354,185, along with post-judgment interest. SA33.

## SUMMARY OF ARGUMENT

The district court erred by denying Verizon Communications fact discovery to support its defenses, and by recognizing a judgment that was rendered in flagrant violation of an arbitration agreement and under circumstances that called the integrity of the proceedings into question. This Court should reverse.

**I.**     The district court committed a clear error of law when it declined to reach the merits of Verizon Communications' defenses to recognition on the basis that the arguments had been raised, or could have been raised, in the Costa Rican proceedings. Foreign judgments are not automatically entitled to deference, even under notions of comity. Instead, courts must evaluate the merits of a foreign court's reasoning before deciding whether deference is warranted. The district court's determination that deference is automatic—that it was powerless to "revisit" anything the Costa Rican courts decided, *e.g.*, SA26–27—conflicts with the text of Article 53, clashes with the federal courts' longstanding approach to foreign judgments, and would render meaningless the statute's defenses to recognition.

**II.**     The Master Purchase Agreement contained a mandatory arbitration provision providing that all disputes concerning the Agreement, including any "claim" of "breach," "shall be resolved by final and binding arbitration." JA1011. THS's lawsuit—which alleged breach of the Master Purchase Agreement—falls squarely within this provision. The district court should have denied recognition because the Costa Rican courts lacked jurisdiction; the proceedings were contrary to the Master Purchase Agreement's arbitration provision; and the resulting judgment is repugnant to the public policies of the United States and New York favoring arbitration—all of which are independently sufficient grounds for denying recognition under Article 53. *See* CPLR § 5304(a)(3), (b)(5), (b)(3).

**III.**    The district court erred in granting summary judgment on Verizon Communications' defenses that the circumstances surrounding the Costa Rican proceedings raised doubt about the integrity of the proceedings and violated due process.  Article 53 was recently amended to provide additional protections to defendants challenging recognition of foreign judgments by directing courts to consider not just the fairness of the foreign nation's judicial system as a whole, but the circumstances and events surrounding the specific proceeding.  Here, these circumstances and events—from the close connections between THS's counsel and the judges hearing this case, to the Costa Rican courts' jurisdictional grab and extraordinary legal rulings, to the stunning and irrational damages award—left no doubt that these proceedings lacked integrity and violated due process.  At a minimum, this question should not have been decided on summary judgment.

**IV.**    The district court erred and abused its discretion by barring Verizon Communications from conducting fact discovery.  Only in the rarest of cases may a district court grant summary judgment without allowing the nonmovant to take discovery.  So long as a party shows that the information it seeks is germane to one of its defenses, and is not cumulative or speculative, discovery must be allowed.  Here, Verizon Communications supplied a detailed affidavit explaining the precise discovery it needed and how it would support its defenses to recognition.  The district court's decision to bar any factual discovery was devastating.  The court then

compounded its error by granting THS summary judgment and faulting Verizon Communications for failing to identify evidence supporting its defenses—the very evidence it had sought to obtain in discovery.

## STANDARD OF REVIEW

The district court's summary judgment decision, *SerVaas Inc. v. Republic of Iraq*, 540 F. App'x 38, 40 (2d Cir. 2013), whether the district court applied the proper legal standard, *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006), as well as the "district court's rulings on questions of foreign law," *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 809 F.3d 737, 742 (2d Cir. 2016), are all reviewed de novo. The district court's denial of the Rule 56(d) motion is reviewed for abuse of discretion. *Elliott v. Cartagena*, 84 F.4th 481, 493 (2d Cir. 2023).

## ARGUMENT

### I. The District Court Erroneously Gave Preclusive Effect To The Costa Rican Courts' Decisions.

The district court committed an overarching legal error in denying Verizon Communications' defenses to recognition. As it rejected one non-recognition defense after another, it stated that where the Costa Rican courts had reached an issue, or could have reached an issue, it would "not revisit the determination" of the foreign courts. SA26; *see also*, *e.g.*, SA12 ("the court will not revisit the foreign court's determination of its own jurisdiction"); SA16 (it "is not for this Court to revisit" the

Costa Rican courts' ruling); SA17 ("grant[ing] preclusive effect" as to Costa Rican courts' jurisdictional rulings and determination that liability waiver was null and void); SA25 ("the Court respects the Costa Rican courts' determination as to the applicability of the arbitration provisions").

The district court committed a clear legal error in holding that it was required, in a judgment-recognition proceeding, to give preclusive effect to a foreign court's decision. "The issue of whether a foreign-country judgment will be recognized is distinct from both the issue of whether the judgment will be enforced, and the issue of the extent to which it will be given preclusive effect." Unif. Foreign-Country Money Judgments Recognition Act § 4 cmt. 2 (2005). "[A] foreign-country judgment . . . must be recognized *before* it can be given preclusive effect under res judicata and collateral estoppel principles." *Id.* (emphasis added); *see, e.g.*, *Yukos Cap. S.A.R.L. v. OAO Samaraneftegaz*, 963 F. Supp. 2d 289, 295 (S.D.N.Y. 2013) (rejecting argument that collateral estoppel precluded party from "re-litigating" question of proper notice abroad); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 325 n.5 (S.D.N.Y. 2009) (rejecting argument that claim was "barred under the doctrine of *res judicata*" because "the relevant order was issued in a foreign bankruptcy proceeding"). The district court put the cart before the horse when, in deciding whether to recognize the judgment, it held it was required

to first give preclusive effect to the judgment (and the underlying reasoning) on all matters that bore on recognition defenses.

The text of Article 53 makes clear that U.S. courts are not bound by the foreign court's decision in deciding whether to recognize the foreign court's judgment. Section 5304(a)(3) provides that a court "*may not recognize* a foreign country judgment if . . . the foreign court did not have jurisdiction over the subject matter" (emphasis added). This is mandatory language that admits of no exception for cases where the foreign court believed that it had subject-matter jurisdiction. Indeed, if U.S. courts *were* bound by the foreign court's determination that it had subject-matter jurisdiction, section 5304(a)(3) would be rendered meaningless because in every case where a foreign court renders a judgment, it necessarily determines it has subject-matter jurisdiction. If the foreign court did not believe it had subject-matter jurisdiction, it could not have rendered the judgment. *See Matzell v. Annucci*, 64 F.4th 425, 432 (2d Cir. 2023) (courts should avoid interpretations that render "the statute meaningless and hamper the purpose of the statute"). Section 5304(a)(3) requires the U.S. court to make its own independent determination whether the foreign court had jurisdiction over the subject matter, rather than deeming itself bound by the foreign court's conclusion.

The same is true for the section 5304(b) defenses. Section 5304(b)(5) allows for non-recognition when "the proceeding in the foreign court was contrary to an

agreement" to arbitrate.  But in cases where this ground is invoked, the foreign court will almost certainly have already rejected the defendant's attempt to refer the case to arbitration.  If U.S. courts were bound by the foreign court's determination that the proceeding was not contrary to an arbitration agreement, section 5304(b)(5)'s defense to recognition would be rendered meaningless.  Indeed, the practice commentary to this section states that the U.S. court "must look into the reason why the foreign court disregarded the ouster agreement," *i.e.*, the agreement in which the parties ousted the foreign court of jurisdiction in favor of arbitration.  Richard C. Reilly, *Practice Commentaries to Section 5304 (Proceeding Contrary to Agreement)* (2021).

Likewise, section 5304(b)(3) contemplates that the U.S. court make its own independent inquiry, and is not bound by any rulings of the foreign court, in determining whether the judgment "is repugnant to the public policy of this state or of the United States."  Indeed, it would be unthinkable for a U.S. court to deem itself bound by a foreign court's determination that its judgment did not offend U.S. public policy.

General principles of comity confirm that while U.S. courts may in appropriate cases defer to a foreign state's determinations of its own law, they are not *bound* by them.  In *Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co. Ltd.*, 585 U.S. 33, 43 (2018), the Supreme Court held that under principles of

international comity, a "federal court should carefully consider a foreign state's views about the meaning of its own laws," but the "court is neither bound to adopt the foreign government's characterization nor required to ignore other relevant materials." And in *Diorinou v. Mezitis*, 237 F.3d 133, 145–46 (2d Cir. 2001), this Court carefully considered the merits of a Greek court's reasoning before deciding to defer to it. In short, "deference to a foreign adjudication as a matter of comity is by no means automatic." *Films by Jove, Inc. v. Berov*, 250 F. Supp. 2d 156, 191 (E.D.N.Y. 2003) (declining to defer to an unpersuasive opinion from a Russian court).

Article 53 aims to further international comity, *see* Siegel, *New York Practice* § 472, but it does not pursue comity by recognizing foreign judgments at all costs. Rather, the statute reflects a careful "balance," *Network Fin. Inc. v. JPMorgan Chase & Co.*, 41 A.D.3d 254, 255 (N.Y. App. Div. 2007), or "compromise" between two "sometimes conflicting principles in the law of recognition and enforcement of foreign judgments": both comity *and* "fairness to litigants, or fairness regarding the underlying transaction," *Ackermann v. Levine*, 788 F.2d 830, 842 (2d Cir. 1986) (citations omitted); *see also* N.Y. Bill Jacket, 2021 S.B. 523, Ch. 127 (noting that Article 53 "strike[s] a careful balance"). Comity, while important, is not "a matter of absolute obligation." *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895); *see also Animal Sci. Prods.*, 585 U.S. at 43. Applying collateral estoppel and preclusion the way the district court did here advances the comity principle at the expense of the fairness

24

principle, thereby extinguishing Article 53's goal of "protecting New York litigants from injustice." N.Y. Bill Jacket, 2021 S.B. 523, Ch. 127.

In holding that the Costa Rican rulings precluded Verizon Communications' Article 53 defenses, the district court misread this Court's summary order in *ICC Chemical Corp. v. TCL Industries (Malaysia) SDN*, 206 F. App'x 68 (2d Cir. 2006). In that case, the district court deferred to a Singaporean court's "specific finding . . . that the parties never agreed to arbitrate," and this Court found it "proper to grant preclusive effect to the Singapore Court's finding as a matter of comity." *Id*. at 69–70. *ICC Chemical* actually illustrates the district court's error. This Court emphasized that "when a domestic court accepts the adjudication of a foreign tribunal on a particular issue, it does so as a matter of comity," *id*. at 70 (citing *Diorinou*, 237 F.3d at 139)—that is, a U.S. court is not compelled to do so as a matter of res judicata or issue preclusion. The Court explained that "[t]he decision of whether to extend comity to a foreign court's adjudication" requires "thorough consideration" of many "factors," including "the fairness of the foreign court's adjudicating system." *Id*. And the Court stated that "comity generally prevails *if the foreign court had proper jurisdiction*"—making clear that a U.S. court must confirm the foreign court had proper jurisdiction *before* it decides whether deference is appropriate as a matter of comity. *Id*. (emphasis added). To be sure, the *ICC Chemical* Court ultimately

concluded that comity was warranted under the circumstances of that case, but that simply underscores the point that comity is not automatic.

Here, the district court failed to follow the analytical path described in *ICC Chemical*. It accepted the Costa Rican rulings without making its own independent determination that "the foreign court had proper jurisdiction." 206 F. App'x at 70. Nor did it give "thorough consideration" to the many "factors" bearing on whether to defer as a matter of comity. *Id*. Instead, it approached the issue as though the prior proceedings had occurred in a U.S. court and ordinary res judicata principles applied. The district court's erroneous application of res judicata also leads to an absurd result that is contrary to Article 53's purpose. Because courts will "reexamine jurisdictional issues in cases where the foreign judgment was entered on a default," *Sung Hwan Co., Ltd. v. Rite Aid Corp.*, 847 N.Y.S.3d 78, 79 (App. Div. 2007) (citation omitted), a litigant would be better off defaulting instead of appearing in the foreign court to defend itself. This Court should not endorse a rule of law that would undermine international comity by incentivizing U.S. citizens to default when sued abroad.

## II. The District Court Erred In Recognizing The Costa Rican Judgment Because The Judgment Violated An Arbitration Agreement.

Article 53 is fiercely protective of agreements to arbitrate. It provides three separate grounds for declining recognition of foreign judgments obtained in violation of an agreement to arbitrate: "the foreign court did not have jurisdiction over

26

the subject matter," CPLR § 5304(a)(3); "the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by a proceeding in that court," *id.* § 5304(b)(5); and "the judgment or the cause of action on which the judgment is based is repugnant to the public policy of this state or of the United States," *id.* § 5304(b)(3). Verizon Communications raised all three grounds as defenses to recognition. The district court erred in rejecting them on the basis that the Costa Rican courts had exercised jurisdiction and declined to enforce the Master Purchase Agreement's arbitration provision—and the district court was bound by the foreign courts' rulings and could not revisit them.

### A. Verizon Communications Established Three Grounds For Non-Recognition Based On The Arbitration Agreement.

It is undisputed that the Master Purchase Agreement contains an arbitration provision. It states: "[A]ny dispute, controversy or claim arising out of or relating to this Agreement or any breach thereof, shall be resolved by final and binding arbitration." JA1011. The arbitration provision also specifies the location for arbitration (Puerto Rico); the law for interpreting the contract (Costa Rican); the language of the proceedings (English); the rules governing the proceedings (the International Chamber of Commerce's Rules of Conciliation and Arbitration); and the necessary qualifications for the arbitrators. *Id.* None of those bargained-for provisions were honored by the Costa Rican courts.

27

The arbitration agreement gives rise to three independent grounds for nonrecognition under Article 53.

*First*, the Costa Rican courts "did not have jurisdiction over the subject matter." CPLR § 5304(a)(3). Per the mandatory arbitration clause, which provided that all contract-related disputes "shall" be resolved by final and binding arbitration, no Costa Rican court should have decided the case. The Costa Rican courts held that they had jurisdiction because ICE had been named as a defendant. JA2425–26; *see also* JA1220. But ICE's presence cannot justify refusing to enforce the arbitration clause. Arbitration agreements cannot be circumvented merely by naming an additional defendant who is a nonsignatory to the agreement. *See Revis v. Schwartz*, 140 N.Y.S.3d 68, 71–73, 80–81 (App. Div. 2020) (arbitration agreement applies where plaintiff seeks to hold both signatory and non-signatory defendants jointly and severally liable); JA1187–88 (Costa Rican law provides that non-parties can be held to arbitration clauses). Moreover, THS's decision to name ICE as a defendant was pretextual. ICE was not a party to the Master Purchase Agreement, JA989, so THS had no colorable basis for suing it for breach of contract. The Costa Rican courts confirmed this by ultimately rejecting THS's claims against ICE. JA1170.

*Second*, "the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by a proceeding in that court." CPLR § 5304(b)(5). THS and Verizon

Costa Rica agreed to arbitrate any claims concerning breach of the Master Purchase Agreement, JA1011, and THS's lawsuit alleged Verizon Costa Rica breached the Master Purchase Agreement.  In fact, it does not appear anyone disagrees the plain language of section 5304(b)(5) is satisfied here:  Even the Costa Rican courts did not dispute—nor could they—that the litigation was "contrary to an agreement" to arbitrate.  The Costa Rican courts simply held that the presence of ICE gave rise to jurisdiction in the administrative court and declined to enforce the arbitration agreement.  JA1187.  The district court therefore erred in recognizing a judgment that was plainly and indisputably "contrary to an agreement" to arbitrate.  *See, e.g.*, *Montebueno Mktg., Inc. v. Del Monte Foods Corp.-USA*, 570 F. App'x 675, 677 (9th Cir. 2014) ("The district court found that the Philippine litigation that produced the foreign judgment here was 'contrary to' an arbitration agreement . . . . We agree."), *aff'g*, 2012 WL 986607, at *2 (N.D. Cal. Mar. 22, 2012); *Automotores Galindo, S.A. v. Ford Motor Co.*, 2015 WL 4606561, at *6 (S.D. Fla. July 31, 2015) (declining to recognize Bolivian judgment under Florida recognition statute when agreement to arbitrate was "clear and unambiguous"); *Tyco Valves & Controls Distrib. GmbH v. Tippins, Inc.*, 2006 WL 2924814, at *7 (W.D. Pa. Oct. 10, 2006) ("Because the German proceeding was contrary to the parties' agreement to arbitrate, we decline to enforce it here.").

*Third*, the Costa Rican judgment is "repugnant to the public policy of this state [and] the United States." CPLR § 5304(b)(3). Both the United States and New York have strong public policies favoring arbitration. *See Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (the Federal Arbitration Act "establishes a federal policy favoring arbitration" (quotation marks omitted)); *Curtis, Mallet-Prevost, Colt & Mosle, LLP v. Garza-Morales*, 762 N.Y.S.2d 607, 613 (App. Div. 2003) ("New York's policy in favor of arbitration [is] so strong that it overrides all but a very few other public policies of the State itself."). It would frustrate that policy to allow THS to sue for breach of the Master Purchase Agreement, seeking the benefits of that contract while circumventing the contract's arbitration provision. *See In re Long Island Power Auth. Hurricane Sandy Litig.*, 87 N.Y.S.3d 576, 582 (App. Div. 2018) (holding plaintiffs to terms of arbitration agreement in contract they sued under). Indeed, it would be repugnant to U.S. policy favoring arbitration to recognize a judgment that was indisputably imposed in blatant violation of a clear and unambiguous agreement to arbitrate. *See Nicor Int'l Corp. v. El Paso Corp.*, 292 F. Supp. 2d 1357, 1375 (S.D. Fla. 2003) ("[A] decision by this Court to recognize the decision of the Dominican courts would violate clear United States public policy which favors arbitration."); *In re Arbitration Between Chromalloy Aeroservices & Arab Republic of Egypt*, 939 F. Supp. 907, 913 (D.D.C. 1996) ("A

30

decision by this Court to recognize the decision of the Egyptian court would violate this clear U.S. public policy.").

That Verizon Communications was not a party to the Master Purchase Agreement has no bearing on whether the proceedings below were contrary to an arbitration agreement or whether the resulting judgment is repugnant to U.S. public policy. Verizon Costa Rica *was* a party to the Master Purchase Agreement and expressly demanded that the dispute be sent to arbitration. *See* JA719, 911. So the arbitration provision was properly invoked by a party that indisputably had the right to invoke it.

Verizon Communications had the right to invoke the arbitration provision in any event. THS argued, and the Costa Rican courts agreed, that Verizon Communications should be held to the obligations of the Master Purchase Agreement as though it were a party to the contract. And if Verizon Communications is held to the *obligations* of a party to the contract, it is entitled to invoke the *rights* of a party to the contract, including the arbitration provision. *See Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999) (upholding non-signatory defendant's right to enforce arbitration agreement because plaintiff had "treat[ed] the [defendant] entities as a single unit" in foreign litigation); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir.

31

1999) ("A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause.").

**B.    The Costa Rican Courts' Failure To Enforce The Arbitration Agreement Does Not Preclude The Arbitration-Related Defenses.**

In rejecting Verizon Communications' arbitration-related defenses, the district court held it would "not revisit the foreign court's determination of its own jurisdiction" or its "application of the arbitration clause."  SA12, 17.  In the district court's view, Article 53's arbitration-related grounds for non-recognition were dead on arrival because the Costa Rican courts had already exercised subject-matter jurisdiction and refused to enforce the arbitration agreement.

The district court's approach was mistaken for the reasons discussed above. *See* Part I *supra*.  A court in the United States is not required to accept the decision of a foreign court under res judicata principles that do not apply in recognition actions.  *See Automotores Galindo*, 2015 WL 4606561, at *5 ("Ordinary res judicata principles are not determinative here because the application of those principles here would nullify the purpose of the Florida Recognition Act.").  Although a U.S. court may defer to a foreign decision as a matter of comity, doing so requires the U.S. court to make an independent assessment of the foreign court's jurisdiction, and perform a far more thorough analysis than the district court did here.  *See ICC Chem.*, 206 F. App'x at 70.

The district court's decision conflicts with decisions of at least five other courts that have declined to recognize foreign judgments obtained in violation of an arbitration agreement—even though the foreign court held the agreement inapplicable in the foreign proceedings. *See Montebueno Mktg.*, 570 F. App'x at 677; *Automotores Galindo*, 2015 WL 4606561, at *4–6; *Tyco Valves*, 2006 WL 2924814, at *7; *Nicor*, 292 F. Supp. 2d at 1375; *Chromalloy Aeroservices*, 939 F. Supp. at 913–14.

The district court's determination that the arbitration issues were definitively resolved by the Costa Rican courts' rulings is wrong for another reason:  The Costa Rican courts never decided that the litigation was not contrary to an agreement to arbitrate.  Instead, they sidestepped the question, reasoning that under Costa Rican law the administrative court could still exercise jurisdiction over the litigation.  Accordingly, the district court erred in holding that Verizon Communications was collaterally estopped from arguing that "the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by a proceeding in that court." CPLR § 5304(b)(5).  The Costa Rican courts never decided that question.

The district court further erred in holding that the question whether the proceedings were "contrary to an agreement" to arbitrate within the meaning of CPLR § 5304(b)(5) "is a question of Costa Rican law." SA23.  It is not.  "New York law

governs actions brought in the State of New York to enforce judgments from foreign countries." *Servipronto De El Salvador, S.A. v. McDonald's Corp.*, 837 F. App'x 817, 819 (2d Cir. 2020); *see also Seetransport Wiking Trader v. Navimpex Centrala Navala*, 989 F.2d 572, 582 (2d Cir. 1993) ("the recognition of foreign judgments is governed by state law"); Restatement (Second) of Conflicts § 98 cmt. C (Supp. 1988) ("The consensus among the State courts and lower federal courts is that, apart from federal question cases, such recognition is governed by State law and that the federal courts will apply the law of the State in which they sit."). In *Automotores Galindo*, 2015 WL 4606561, at *5–6, for example, the court analyzed whether the foreign proceedings were "contrary to" an arbitration agreement as a question of U.S. not Bolivian law. For this reason too, the district court committed clear and indisputable legal error in rejecting Verizon Communications' arbitration-related defenses to recognition. The court held the wrong law governed.

## III. The District Court Erred In Recognizing The Costa Rican Judgment Because There Is A Genuine Dispute Over Whether The Foreign Proceedings Lacked Integrity And Violated Due Process.

Article 53 was recently amended to require courts to examine "the specific proceeding in the foreign court"—and the particular "circumstances" surrounding the specific proceeding—rather than just assess the foreign nation's overall legal system. *See* CPLR § 5304(b)(7)–(8); N.Y. Bill Jacket, 2021 S.B. 523, Ch. 127. The

amended provision recognizes that even in nations with strong and respected legal systems, things can go awry in a particular case. They did here.

The district court erred in denying Verizon Communications' defenses under CPLR § 5304(b)(7)–(8) and granting summary judgment in favor of THS. The record before the court precluded resolving these defenses on summary judgment. Even though it was denied discovery that would have supported its defenses, *see* Part IV *infra*, Verizon Communications demonstrated, at a minimum, that there were sufficient facts from which a reasonable factfinder could have found "circumstances that raise substantial doubt about the integrity of the rendering courts with respect to the judgment" and that "the specific proceeding in the foreign court" did not reflect due process of law. CPLR § 5304(b)(7)–(8).

### A. Article 53 Requires An Assessment Of The "Circumstances" Giving Rise To The Judgment And A Focus On The "Specific Proceeding."

The New York Legislature amended Article 53 in 2021. Before that time, the only express due process-related ground for non-recognition involved situations where "the judgment was rendered under *a judicial system* that does not provide impartial tribunals or procedures compatible with the requirements of due process of law." CPLR § 5304(a)(1) (emphasis added). The reference to a foreign nation's judicial "system" seemed to forbid U.S. courts from considering whether *the specific proceeding* that led to the judgment had been conducted in a fair manner. *See Soc'y*

*of Lloyd's v. Edelman*, 2005 WL 639412, at *4 (S.D.N.Y. Mar. 21, 2005) ("[T]he Recognition Act directs this Court to examine the fairness of the English *system,* rather than evaluate the individual action."); *Akhmedova v. Akhmedov*, 139 N.Y.S.3d 33, 35–36 (App. Div. 2020).

In 2021, the Legislature added two new defenses to recognition that authorize courts to examine the fairness of the specific proceedings and judgment at issue. Section 5304(b)(7) directs courts to consider whether "the judgment was rendered in circumstances that raise substantial doubt about the integrity of the rendering courts with respect to the judgment." Section 5304(b)(8) directs courts to consider whether "the specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law." These two new defenses amounted to a "substantial" change in New York's judgment-recognition law, Siegel, *New York Practice* § 472, and furthered the Legislature's purpose of protecting litigants from unfair foreign judgments, *see* N.Y. Bill Jacket, 2021 S.B. 523, Ch. 127.

## B. The Costa Rican Proceedings Lacked Integrity And Violated Due Process.

1.  The "circumstances" surrounding the Costa Rican proceedings give rise to more than "substantial doubt about the integrity of the rendering courts with respect to the judgment." CPLR § 5304(b)(7). THS is a politically-connected company owned by one of the most prominent families in Costa Rica, headed by the

36

nation's former president and his sons, who themselves held high political office. JA1168. THS built a legal team with strong connections to the judges who would be deciding this case. One judge had described THS's lead counsel as her "mentor" and "father" figure. JA2411. Another THS lawyer had an actual familial connection to the court: he is the brother of the former President of the Supreme Court of Justice of Costa Rica. *Id.* It is unlikely this lawyer was hired by THS for his litigation skills because he had no litigation experience at all. *Id.*

Verizon Communications' concerns that the judges' relationships with THS and its lawyers could give rise to bias and favoritism were not speculative. In light of those close relationships, Verizon Communications "requested that a set of substitute judges hear the matter because the First Chamber judges were presiding over the matter under circumstances that presented reasonable doubt as to [their] impartiality or objectivity." JA2411. A Costa Rican judge agreed and *granted* Verizon Communications' motion to recuse the judges slated to hear the case. JA2411–12. That ruling was abruptly reversed with no explanation, raising serious concerns that there had been *ex parte* communications behind the scenes. *Id.* But the fact that an independent Costa Rican judge *agreed* with Verizon Communications that recusal was warranted provides a sufficient factual basis to defeat summary judgment on this defense. A reasonable factfinder could have determined that the recusal order establishes "substantial doubt about the integrity of the rendering courts with respect

to the judgment." CPLR § 5304(b)(7). Verizon Communications' defense had factual support and should not have been resolved at the summary-judgment stage.

From beginning to end, the Costa Rican proceedings were plagued by a lack of integrity and constant denials of due process. This case did not even belong in a Costa Rican courtroom. The arbitration clause specifically required that claims for breach of contract "shall" be resolved through arbitration in Puerto Rico. JA1011. The administrative court disregarded the arbitration clause and refused to hold THS to the plain language of its agreement in order to seize control of this case. JA1187.

There was no basis for jurisdiction in any Costa Rican court, especially not the administrative court. Because this case involved a dispute over the Master Purchase Agreement between the two private companies that signed it (THS and Verizon Costa Rica), Costa Rican law mandated that it be heard in civil court. JA1170, 1225, 2439. THS manufactured the administrative court's purported jurisdiction through the transparently pretextual addition of ICE, the government entity, that was not a party to the Master Purchase Agreement but was named solely to enable the administrative court to claim jurisdiction, enabling THS to obtain a forum that would be more favorable to a company with close ties to the Costa Rican government. *Id.*

Having seized jurisdiction, the administrative court twisted Costa Rican law, and defied basic norms of due process, by holding Verizon Communications liable for breaching a contract to which it was not a party in connection with a dispute it

had absolutely nothing to do with. The court's "economic interest group" theory itself violates due process, and the way it was warped and expanded by the court to impose liability on Verizon Communications—a complete stranger to the underlying dispute—compounded the violation. JA1171, 1179–86, 1225–26, 2409; *see also EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("a contract cannot bind a nonparty"). The court violated due process in another respect: It held that Verizon Communications was a party to the Master Purchase Agreement for purposes of being held liable for breach of contract, but simultaneously held it was *not* a party to the contract for purposes of invoking the liability waiver. *See Smith/Enron Cogeneration*, 198 F.3d at 97–98 (party cannot be held to burdens of contract while being denied its benefits).

The stunning award of damages confirmed the lack of procedural integrity and took the ongoing due process violations to a stratospheric level. The Master Purchase Agreement was a contract to print phone books that was worth at most $10 million had it been fully performed. JA1244, 1246–47. Indeed, THS estimated that the contract would have been worth approximately $8.8 million had it lasted for its full 8-year term. JA106–07. Awarding $100 million for breach of this contract is arbitrary, punitive, and irrational—the antithesis of due process of law. The GTE-ICE contract was worth $10 million—and the Master Purchase Agreement was a *subcontract* of that contract. JA2412.

The Costa Rican court ratified this exaction by asking a "judicial expert" to bless the report of THS's damages expert—with the judicial expert's compensation determined as a percentage of the award approved by the court.  JA1198–99, 2413.  A reasonable factfinder could permissibly conclude that an arrangement in which the judge's adjunct keeps a cut of the award violates due process and, at a minimum, raises "substantial doubt about the integrity of the rendering courts with respect to the judgment."  CPLR § 5304(b)(7).

    **2.**    The district court erred in granting THS summary judgment as to Verizon Communications' defenses under section 5304(b)(7) and (8).

The court committed legal error, and misapprehended the nature of the inquiry, by focusing on Costa Rica's judicial system as a whole, rather than the particular circumstances surrounding this specific proceeding.  Even though Verizon Communications made no argument challenging the integrity of the Costa Rican judicial system, the district court stated that "Costa Rica has one of the more independent, advanced judicial systems in Latin America," and "Verizon's own expert confirmed that the judges on the Supreme Court of Justice are competent and well-respected."  SA28 (quotation marks and citation omitted).  Even assuming all of that to be true, it does not answer the question whether this specific proceeding was tainted by a lack of integrity and violations of due process.

The court also erred in concluding that because Verizon Communications participated in the foreign proceedings, it got all the process it was due. SA14–15, 18, 22. But CPLR § 5304(b)(8)'s use of "due process" contemplates something more. Earlier provisions in the statute—section 5304(b)(1)–(2)—address situations where a litigant did not have adequate notice or an opportunity to defend in the foreign court. For the provisions to not be redundant, the "due process" contemplated by section 5304(b)(8) must mean something more than the right to notice and an opportunity to be heard described in section 5304(b)(1) and (2). *See Bainbridge Fund Ltd. v. Republic of Argentina*, 37 F.4th 847, 851 (2d Cir. 2022) ("[M]eaning and effect should be given to every word of a statute and . . . an interpretation that renders words or clauses superfluous should be rejected." (citation omitted)). Moreover, the district court brushed aside the argument that Verizon Communications' substantive due process rights had been violated. *See* Montré D. Carodine, *Political Judging: When Due Process Goes International*, 48 Wm. & Mary L. Rev. 1159, 1187, 1244–46 (2007) (arguing that "due process" in the recognition context includes substantive due process). As one secondary source put it: "Joan of Arc was denied substantive due process no matter what service was had and no matter if procedural niceties were observed. These same principles apply to the judgments of foreign countries." 3 Joel R. Brandes, *Law and the Family New York* § 41:17 (2023 ed.).

Finally, the district court improperly minimized the disturbing series of events and rulings that led to the judgment by claiming that Verizon Communications could not rely on errors in law or fact when arguing for non-recognition. SA28–29. But U.S. courts have held that when a foreign court has deviated substantially from its own law, or declined to follow widely-understood due process norms, blind acceptance of a foreign opinion is unwarranted. For example, in *Berov*, the court declined to defer to a ruling from a Russian court because the decision was "plainly contrary to the facts and the reality on the ground," and did "not accord with Soviet or Russian law." 250 F. Supp. 2d at 197–98. Here, in contrast, the district court made no meaningful assessment of the facts, Costa Rican law, or the integrity of the specific proceedings below. At a minimum, the district court could have held a hearing to determine the correct interpretation of Costa Rican law, as Verizon Communications had requested. Dkt. 53 at 12; *see* Fed. R. Civ. P. 44.1; *United States v. Schultz*, 333 F.3d 393, 400 (2d Cir. 2003) (noting that district court held an evidentiary hearing to determine the meaning of Egyptian law under the equivalent Rule of Criminal Procedure).

The substantial evidence of irregularities—from the close connections between THS's counsel and the judges hearing this case, to the Costa Rican court's jurisdictional grab and extraordinary legal rulings, to the stunning and irrational

42

damages award—obliged the district court to make its own independent determination as to whether these proceedings lacked integrity and violated due process.

## IV. The District Court Erred In Denying Verizon Communications Any Fact Discovery Before Granting Summary Judgment.

Verizon Communications sought fact discovery to support its defenses to recognition. When THS filed its judgment-recognition action and immediately demanded summary judgment, Verizon Communications moved under Federal Rule of Civil Procedure 56(d) and submitted a detailed declaration identifying the evidence it sought and explaining why the evidence was "germane to [its] defense." *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 151 (2d Cir. 2016) (citation omitted). The district court acknowledged that "it is the rare case" when a court "adjudicates summary judgment without any discovery," but it then denied the Rule 56(d) motion and adjudicated summary judgment without any fact discovery. JA571. The unfairness of the discovery denial became clear when the district court then granted THS summary judgment and faulted Verizon Communications for not providing the very evidence the court had prevented it from obtaining. SA29.

### A. Rule 56(d) Allows Discovery "Germane To A Defense."

Summary judgment "is a drastic device" that "cuts off a party's right to present his case to [a factfinder]." *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999) (quotation marks omitted). Accordingly, the "non-moving party must have had the opportunity to discover information that is essential

to his opposition." *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 83 (2d Cir. 2018) (quotation marks omitted).

It is "[o]nly in the rarest of cases" that "summary judgment [may] be granted against a [party] who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veteran Affs.*, 201 F.3d 94, 97 (2d Cir. 2000). Granting summary judgment without allowing a party to conduct adequate discovery is an abuse of discretion, *Elliott*, 84 F.4th at 494, and this Court has often reversed for that reason. *See, e.g.*, *Ass'n of Car Wash Owners*, 911 F.3d at 83–84; *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 303–04 (2d Cir. 2003); *Com. Cleaning Servs, LLC v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 386 (2d Cir. 2001); *Hellstrom*, 201 F.3d at 97; *Sutera v. Schering Corp.*, 73 F.3d 13, 18 (2d Cir. 1995); *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995).

When a party is served with a motion for summary judgment, Federal Rule of Civil Procedure 56(d) allows the nonmovant to request discovery before the court rules on summary judgment. The nonmovant must identify "by affidavit or declaration" the information that it seeks. Fed. R. Civ. P. 56(d). The district court may then "defer considering" the motion for summary judgment or "allow time . . . to take discovery." *Id*.

To obtain discovery under Rule 56(d), the nonmovant must show that the information it seeks is "germane to [a] defense." *Alphonse Hotel*, 828 F.3d at 151

44

(citation omitted). It must also show that the requested discovery is "neither cumulative nor speculative." *Id*. (citation omitted). Courts apply Rule 56(d) with a "spirit of liberality." *Dubai Islamic Bank v. Citibank, N.A*., 126 F. Supp. 2d 659, 665 (S.D.N.Y. 2000) (citation omitted).[2]

### B. Verizon Communications Was Entitled To Fact Discovery.

**1.** Verizon Communications satisfied the Rule 56(d) standard by specifying three types of discovery germane to its recognition defenses. JA528–43.

*First*, Verizon Communications sought *ex parte* communications between THS's counsel and members of the Costa Rican judiciary about this case. JA541–42. This information was germane to its argument that the judgment should not be recognized on the ground that "the judgment was rendered in circumstances that raise substantial doubt about the integrity of the rendering courts with respect to the judgment." CPLR § 5304(b)(7). Indeed, it is hard to imagine evidence *more* germane to that issue than *ex parte* communications between plaintiff's counsel and a presiding judge. The evidence was also germane to Verizon Communications' argument that "the specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law." *Id*. § 5304(b)(8).

---

[2] A party must also note whether it has previously made efforts to obtain the discovery and whether those efforts were successful. Here, because THS filed a pre-discovery motion for summary judgment, Verizon Communications had no opportunity even to request discovery.

Secret communications between a lawyer and a judge about a pending case are relevant to whether that "specific proceeding" was "not compatible with the requirements of due process of law." *See United States v. Rechnitz*, 75 F.4th 131, 147 (2d Cir. 2023) (per curiam) ("[*E*]*x parte* communications are the exception rather than the rule, and they require particular justification.").

*Second*, Verizon Communications sought discovery related to the execution, as well as THS's understanding, of the arbitration provision in the Master Purchase Agreement.  JA539.  That discovery was germane to three of Verizon Communications' defenses to recognition, including under CPLR section 5304(a)(3) ("the foreign court did not have jurisdiction over the subject matter"); section 5304(b)(5) ("the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by a proceeding in that court"); and section 5304(b)(3) ("the judgment or the cause of action on which the judgment is based is repugnant to the public policy of this state or of the United States").  Discovery likely would have established that THS understood and intended, at the time it signed the Master Purchase Agreement, that a dispute like the present one would be arbitrated.  Especially because two of these grounds for non-recognition fall under subsection (b) and are discretionary, evidence that THS *knew* that its lawsuit flagrantly violated its agreement to arbitrate would

46

have been highly relevant to nonrecognition. It would have demonstrated that there was no unfairness in holding THS to the agreement it signed.

*Third*, Verizon Communications sought discovery concerning ICE's involvement in the lawsuit. That discovery was germane to two of Verizon Communications' defenses to recognition: that the Costa Rica administrative court lacked jurisdiction, *see* CPLR § 5304(a)(3), and that there was substantial doubt about the integrity of the rendering courts with respect to the judgment, *see id*. § 5304(b)(7). Throughout this litigation, Verizon Communications has maintained that THS "fraudulent[ly]" included ICE in the lawsuit as a "pretext for jurisdiction" in the administrative court. JA535. Fact discovery—including email communications between THS and ICE before the lawsuit was filed—could have confirmed it.

For all three categories of discovery, Verizon Communications identified the information it sought and how that information was germane to its defenses in the recognition proceeding. That was plainly sufficient. Verizon Communications met the standard under Rule 56(d) and was entitled to conduct at least *some* fact discovery before the district court ruled on THS's $106 million motion.

47

**2.**     The district court's rationale for denying *all* fact discovery—that Verizon Communications' requests were "speculative," JA573—does not withstand scrutiny.[3]

Verizon Communications filed a detailed declaration setting forth the discovery it sought and explaining how that discovery would support its defenses to recognition. JA528–43.  There was nothing speculative about the requests.  Verizon Communications had strong reason to believe that there were *ex parte* communications between THS's lawyers and the Costa Rican judges hearing this case.  In fact, the relationships were so close that a different Costa Rican judge ordered them recused from the proceeding—a ruling that was quickly and mysteriously overturned, suggesting some sort of backdoor communication between THS and the judiciary.  As to its requests concerning the drafting of the arbitration clause, it is very reasonable to assume there were *some* communications about a key provision that was negotiated and included in the Master Purchase Agreement—indeed, it would be surprising if there were none.  Likewise, as to communications with ICE, it is very reasonable to assume that THS—owned by a politically prominent family with close ties to the government—would have had *some* communications with the government-owned

---

[3]     The district court did permit limited expert discovery, but made clear that "[b]eyond that limited exchange of expert reports or affidavits and the taking of expert depositions, I am denying Verizon's Rule 56(d) motion for fact discovery." JA571.

48

company before naming it as a defendant in a lawsuit, and accusing it of breaching a contract to which it was not a party. *See Oakley v. Dolan*, 2023 WL 3263618, at *3 (2d Cir. May 5, 2023) ("[T]he district court exceeded its discretion in concluding that Oakley's request for additional discovery was too speculative."); *In re Dana Corp.*, 574 F.3d 129, 149 (2d Cir. 2009) (reversing district court for denying additional discovery on grounds it would be "speculati[ve]" (citation omitted)).

The harm, prejudice, and sheer unfairness of the discovery denial became clear when the district court issued its summary judgment ruling. The court faulted Verizon Communications for "not cit[ing] to any evidence" that would support its defense under CPLR § 5304(b)(7) that there were "circumstances that raise substantial doubt about the integrity of the rendering courts with respect to the judgment." SA29. That was the very evidence Verizon Communications had tried to seek in discovery.

# CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the district court and enter judgment in favor of Verizon Communications or, in the alternative, reverse and remand for further proceedings.

Dated:  May 15, 2024

Respectfully submitted,

_/s/ Thomas H. Dupree Jr._

Scott A. Edelman
GIBSON DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, CA  90067
(310) 557-8061

Perlette Michèle Jura
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7121

Thomas H. Dupree Jr.
Jeremy M. Christiansen
Claire V. Madill
Cameron J.E. Pritchett
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036
(202) 955-8500

_Counsel for Verizon Communications Inc._

50

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because it contains 11,279 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman font.

Dated:  May 15, 2024                    */s/ Thomas H. Dupree Jr.*
                                               Thomas H. Dupree Jr.

## CERTIFICATE OF SERVICE

I hereby certify that, on May 15, 2024, I caused the foregoing brief to be electronically filed and served on all counsel of record via this Court's CM/ECF system.


_/s/ Thomas H. Dupree Jr._
Thomas H. Dupree Jr.